[This decision has been published in *Ohio Official Reports* at 97 Ohio St.3d 492.]

COLUMBUS BAR ASSOCIATION *v.* MORELAND.

[Cite as *Columbus Bar Assn. v. Moreland*, 2002-Ohio-6726.]

*Attorneys at law—Misconduct—Public reprimand—Improperly soliciting business, aiding in the unauthorized practice of law, and sharing legal fees with nonlawyers.*

(No. 2002-1462—Submitted October 15, 2002—Decided December 18, 2002.)

ON CERTIFIED REPORT by the Board of Commissioners on Grievances and Discipline of the Supreme Court, No. 00-06.

_____

**Per Curiam.**

{¶1} In this case, the Board of Commissioners on Grievances and Discipline found that respondent, Jay M. Moreland of Columbus, Ohio, Attorney Registration No. 0066281, violated the Code of Professional Responsibility by improperly soliciting business, aiding in the unauthorized practice of law, and sharing legal fees with nonlawyers. The cause is now before us on certified report from the board, and we publicly reprimand respondent for his violations of the code.

{¶2} Respondent was admitted to the practice of law in Ohio in 1996. In mid-1998, respondent entered into a contract with ALMS, Ltd., L.L.P., a business that markets legal services. Under the contract, ALMS would send direct-mail solicitations to potential clients for respondent's estate-planning practice. When potential clients responded to the solicitations, ALMS assigned customer services representatives ("CSRs") to interview them. The interview consisted of a sales talk by the CSR, stressing the benefits of establishing a living trust as compared to a will.

{¶3} Although the CSRs disclaimed personal legal expertise, they would discuss the differences between a living trust and the probate of an estate, calculate

the cost of probate, and compare it to respondent's flat fee for the preparation of a living trust. Prospective clients were usually elderly, having an average age of 72 years, and, in some cases, CSRs used obtrusive, high-pressure sales tactics.

{¶4} Respondent did not actively monitor the initial interviews between CSRs and potential clients. Only if questions arose during the interview would a CSR attempt to contact respondent. Until potential clients had signed a representation agreement with the CSR and had paid a retainer, respondent usually did not speak to the potential clients or review the information that they had given the CSR. Respondent relied on that information to determine whether a living trust was suitable for a client. However, in only a few cases did respondent tell a client signed up by a CSR that a living trust was not suitable.

{¶5} When a client decided to set up a living trust, a "delivery representative" was sent to notarize the client's signature on the trust documents and other documents and to secure the documentation, such as deeds, necessary to fund a living trust. Hired by a company affiliated with ALMS, delivery representatives were also supposed to sell insurance to the clients. During the sales talk, the CSRs offered clients the opportunity to accept or reject financial "counseling" by the delivery representatives. No matter whether a client accepted or rejected this counseling, the delivery representatives would try to sell the clients an annuity or policy.

{¶6} Delivery representatives also annually reviewed with clients the status of the assets funding those clients' living trusts. During these annual reviews, they again tried to sell insurance to the clients.

{¶7} ALMS recruited, interviewed, screened, and selected the CSRs and delivery representatives without respondent's involvement. Respondent did not determine who would receive the mailed solicitations, nor did he receive potential clients' responses to mailed solicitations.

{¶8} The CSRs paid their own expenses and received a commission for each client they signed up: $800 per client if the CSR enlisted three or more clients a week, $700 per client for two clients a week, $600 per client for one client a week. CSRs were not paid for any solicitation that did not produce a signed representation agreement, nor were they paid if the client rescinded the agreement. Delivery representatives also bore their own expenses and sold insurance on commission. They were expected to earn between $100,000 and $150,000 annually, principally from selling insurance to respondent's clients. The ALMS area director, who hired the CSRs, got $75 for each new client secured by a CSR. Respondent paid ALMS a weekly service fee of between $180 and $210 for each verified appointment with a potential client.

{¶9} Each client who signed a representation agreement paid a fee of $1,995. After fees and commissions to ALMS and its sales personnel, respondent received between $300 and $500 per client.

{¶10} Each CSR and delivery representative received five days of initial training, only four hours of which were provided by respondent, with ALMS providing the rest. CSRs and delivery representatives also received two-hour refresher training sessions, an hour of which respondent conducted. Apart from the training given by respondent, the CSRs did not know whether the information contained in their sales talks was accurate.

{¶11} During their training, CSRs were directed to answer only those questions from potential clients that respondent authorized them to answer. CSRs were instructed to call respondent immediately if they had any doubt about the correct answer to a potential client's question. However, respondent made no effort to monitor the CSRs for compliance with these directions until relator began these proceedings against him.

{¶12} Other than training and telephone conversations, respondent had little contact with, and seldom exercised control over, the CSRs and delivery

representatives. ALMS retained physical control of the personnel files of the CSRs and delivery representatives, set the amounts they were paid, and paid them through its own accounts. Respondent has acknowledged that, before these proceedings began, he had failed to exercise the degree of control over CSRs that the Code of Professional Responsibility requires.

{¶13} On July 3, 2001, relator, Columbus Bar Association, filed an amended complaint that charged respondent with violating several Disciplinary Rules. A panel of the Board of Commissioners on Grievances and Discipline was convened to consider the ensuing case. Relator and respondent stipulated to the relevant facts, violations, and proposed sanction, and the case was presented to the panel on the basis of the stipulations.

{¶14} The parties stipulated that respondent's conduct violated DR 2-101(A) (public communication or solicitation in a misleading, deceptive, and self-laudatory manner); 3-101(A) (aiding a nonlawyer in the unauthorized practice of law); and 3-102(A) (sharing legal fees with a nonlawyer). Relator withdrew its allegation that respondent had violated four other Disciplinary Rules. The parties jointly recommended that respondent be publicly reprimanded, in view of respondent's previously clean disciplinary record and his "modification of the way he secures clients."

{¶15} Based on the above stipulated facts, the panel prepared and filed with the board a report finding the stipulated violations and recommending a public reprimand. The board adopted the panel's findings of fact and conclusions of law but recommended a six-month suspension from the practice of law. Respondent thereupon moved that this court remand the case to the board for a hearing so that he could submit evidence in mitigation. We granted the motion. *Columbus Bar Assn. v. Moreland* (2002), 94 Ohio St.3d 1497, 764 N.E.2d 441.

{¶16} On remand, after hearing respondent's evidence in mitigation, the panel found that several mitigating factors existed. The panel relied in particular

on respondent's lack of experience, his full cooperation during the disciplinary process, and the absence of monetary harm to the public. The panel also noted other mitigating factors: respondent's previously clean record, the absence of a dishonest motive, and unchallenged testimonials to respondent's good character. In light of the mitigating factors, the panel again recommended that respondent be publicly reprimanded for his misconduct. The board adopted the panel's findings and recommendation.

{¶17} The facts of this case are undisputed, and we agree that respondent committed the misconduct found by the board. In light of the substantial mitigating factors present in this case, we also agree with the board's recommended sanction. Accordingly, respondent is publicly reprimanded for violating DR 2-101(A), 3-101(A), and 3-102(A). Costs are taxed to respondent.

Judgment accordingly.

DOUGLAS, RESNICK, F.E. SWEENEY, PFEIFER and COOK, JJ., concur.

MOYER, C.J., and LUNDBERG STRATTON, J., dissent and would suspend respondent from the practice of law for six months.

————————————

Bruce Campbell, Bar Counsel, Jill M. Snitcher McQuain, Assistant Bar Counsel, Michael J. Hardesty and Louis A. Jacobs, for relator.

Crabbe, Brown & James, Larry H. James and Christina L. Corl, for respondent.

————————————