DISCIPLINARY COUNSEL *v.* WHEATLEY.

[Cite as *Disciplinary Counsel v. Wheatley,*
107 Ohio St.3d 224, 2005-Ohio-6266.]

(No. 2005–0349—Submitted April 13, 2005—Decided December 14, 2005.)

**Per Curiam.**

{¶ 1} Respondent, Myron Daniel Wheatley of Chardon, Ohio, Attorney Registration No. 0038584, was admitted to the practice of law in Ohio in 1987. On August 11, 2003, relator, Disciplinary Counsel, charged respondent with violations of the Code of Professional Responsibility. A panel of the Board of Commissioners on Grievances and Discipline heard the cause, reviewed the parties' comprehensive stipulations, and made findings of misconduct and a recommendation, all of which the board adopted.

Misconduct

{¶ 2} The parties stipulated and the board found that respondent had shared legal fees with a nonlawyer and had thereby violated DR 3–102(A). The board also found that respondent had violated DR 2–103(C), which bars a lawyer from improperly using a person or organization to promote the lawyer's services. Finally, the board found respondent in violation of DR 3–101(A), which prohibits a lawyer from aiding a nonlawyer in the unauthorized practice of law.

*DR 3–102(A) and 3–101(A)*

{¶ 3} From September 2000 through December 2001, respondent had a business relationship with Sharp Estate Services, Inc. ("Sharp"), a company that offered financial-planning strategies mainly involving the promotion of living-trust agreements. Jeffrey Sharp was president of the corporation, which conducted business in conjunction with The Estate Plan, an entity that provided software and other assistance for the preparation of Sharp customers' living trusts. Respondent accepted referrals from Sharp and reviewed aspects of Sharp representatives' sales efforts.

{¶ 4} Sharp identified potential customers through various demographic and consumer information, generally targeting elderly consumers. With those who would agree to meet, Sharp sales representatives scheduled in-person appointments to discuss the advantages of living trusts. These representatives were not licensed to practice law in Ohio.

{¶ 5} Upon meeting with a potential customer, Sharp representatives gave the consumer respondent's business card and information about his professional qualifications. Sometimes, the representatives telephoned respondent during these meetings to obtain answers to a consumer's questions, but usually, respondent did not participate in the initial interview, and he never attended. If the consumer was interested in a living trust and in retaining respondent, the representatives collected personal and financial information and had the customer sign the following documents:

{¶ 6} 1. A statement of disclosure and compliance with Sharp Estate Services, Inc., providing, "I/we understand that the trust and related documents will be processed and printed based on the information that I/we have personally given to the representative and/or attorney";

{¶ 7} 2. A trust purchase agreement with Sharp Estate Services, Inc., providing, "I/we understand that Representative will have a Revocable Living Trust and Estate Planning Portfolio prepared based on the information I/we have provided to him/her and agree that Representative is in no way liable for any errors resulting from my/our incorrect information"; and

{¶ 8} 3. A purchase agreement with The Estate Plan, providing, "I understand that a fixed fee will be paid to legal counsel, The Estate Plan, and an authorized advance for preparation of documents and other services."

{¶ 9} Beginning in July 2001, Sharp representatives also had customers sign a statement of intent providing that the client understood that he or she had the right to select any counsel and was in fact retaining respondent to evaluate his or her estate-planning needs.

{¶ 10} Respondent did not review or approve any training manuals for the sales representatives, nor did he review or approve other written materials used to persuade customers to buy living-trust agreements. At least some of the materials used to train the representatives were written by Henry W. Abts III, also a nonlawyer, who founded The Estate Plan program. The representatives used Abts's book, "The Living Trust: The Failproof Way to Pass Along Your Estate to Your Heirs Without Lawyers, Courts, or the Probate System," as a tool when soliciting customers, even reading passages in answer to customer questions. Respondent did, on two occasions, conduct seminars to instruct groups of Sharp agents about estate planning. At each, respondent cautioned these laypersons not to engage in any activity that might constitute the practice of law.

{¶ 11} Sharp representatives generally obtained payment at the initial meeting. Customers usually paid a flat fee in two checks—one check for Sharp, representing the bulk of the total fee, and a $500 check for respondent. From his share, respondent transferred $350 to The Estate Plan for its contribution. The Sharp representative was also paid a commission of around $500 for signing up customers for living trusts.

{¶ 12} On a number of occasions, customers paid Sharp's entire fee with a credit card, and the payments went to Mid–America, Ohio, another business that Sharp apparently owned. Respondent was unaware of this practice and upon discovering it demanded that customers make all future credit-card payment for his services directly to him. The board thus accepted the stipulation that respondent had violated DR 3–102(A).

{¶ 13} After completing an initial interview, Sharp representatives forwarded to respondent the personal and financial information collected from the customers-turned-clients. Respondent then thanked the client in writing for retaining him and reviewed the client's data. Respondent initially claimed that he had personally contacted each client for a 20– to 30–minute telephone consultation to verify the client's needs. He represented that he always independently determined whether a living trust was in the client's interest. Respondent conceded at the panel hearing, however, that he did not provide professional representation specific to his clients at the critical point when the clients decided whether to choose a living trust.

{¶ 14} Respondent or a member of his support staff, which included his wife, entered information about each client into a software program licensed to him by The Estate Plan. Sharp made the software available, and respondent began using it in September 2000, when respondent and Sharp became associated. The software aided the preparation of living-trust documents with boilerplate language that respondent claimed to have initially reviewed and approved. Respondent also claimed to have customized this language when necessary for a client's

welfare. Respondent also prepared deeds needed to transfer property. Electronic versions of finished documents were sent to The Estate Plan with the $350 fee. For the small minority of clients for whom respondent concluded that a living trust was unnecessary, Sharp and respondent refunded the client's money.

{¶ 15} Contrary to his initial claims, however, respondent admitted at the panel hearing that he had not spoken with every client when he first started working with Sharp. And at those times, his support staff did much of the work to prepare documents based on The Estate Plan software. Respondent's recollection also seemed to change regarding how frequently he had "customized" documents based on the boilerplate language from The Estate Plan program.

{¶ 16} At his deposition, respondent estimated that he had "customized" documents about 50 percent of the time; however, at the hearing, he contended that "[e]ach trust is a little bit different" because, for example, names and dates differ, and "at least 90 percent of the trusts that [he] prepared were different in one form or another." Moreover, respondent conceded that once the client's data were entered into The Estate Plan system, he received from The Estate Plan only a short summary of the trust agreements at first. He usually did not review the trust on his clients' behalf.

{¶ 17} Respondent apparently did exercise total control over the selection and modification of clauses in each client's estate-planning documents. He did not, however, control the printing or binding of documents for the client's use, which was completed by The Estate Plan personnel. The Estate Plan sent the assembled documents to either respondent or Sharp, depending on respondent's instructions. Respondent also received either the trust summary or a copy of the final draft.

{¶ 18} Sharp representatives were responsible for delivering the prepared living trust and other documents to respondent's clients for notarization and execution, but respondent did not supervise this meeting. At this second appointment, the representatives were also trained to present a sales pitch to persuade the clients to purchase fixed annuities or other insurance products to fund their estate plans. If the client bought any additional products, the representative earned an additional commission.

{¶ 19} Clients were not ordinarily warned that more sales pitches would follow their initial purchase of a living trust. Respondent testified that he was also initially unaware that Sharp sales representatives had attempted to sell his clients financial products while obtaining their signatures. He discovered this practice during a deposition taken on June 28, 2001, after the Cleveland Bar Association charged Sharp with the unauthorized practice of law. See *Cleveland Bar Assn. v. Sharp Estate Serv., Inc.*, 107 Ohio St.3d 219, 2005-Ohio-6267, 837 N.E.2d 1183.

{¶ 20} For the overwhelming majority of clients referred by Sharp, respondent provided a living-trust agreement. In fact, respondent estimated that from September 2000 through June 2001, he completed over 900 living trusts for Sharp customers. Respondent continues to represent 200 to 300 of the clients whom Sharp referred to him, and he has intermittently revised their trust agreements, assisted trustees after the grantor's death, and helped transfer assets to beneficiaries. Of all these clients, only one has complained about respondent's selection and/or implementation of a living trust.

{¶ 21} Respondent terminated his association with Sharp at the end of 2001 and began taking referrals from one of Sharp's former sales representative, Sheldon Harve Senter. Senter is also not licensed to practice law in Ohio. Senter had become a sales representative for National Estate Planning ("National"), formerly known as Nationwide Estate Planning, another company that offers estate-planning services.

{¶ 22} Although Sharp páid its sales representatives on commission, respondent and Senter insisted at the panel hearing that Sharp was not in the business of selling living trusts. They described the mindset among sales representatives, who supposedly understood that only an attorney could prepare a living trust. Senter said that the sales force realized that a living trust was not "a trust unless Myron says it's a trust" and that they should not "spend [their] commission until [they got] it." Senter explained that sales representatives "would get quite upset" on the few occasions when respondent decided a living trust was not appropriate for a client.

{¶ 23} In the vast majority of the 900 client referrals, however, respondent prepared a living trust using The Estate Plan software, which meant that sales representatives were routinely paid their commissions. The board thus found that the sale of living trusts, not protection of clients' interests, was the goal of all Sharp representatives. In fact, respondent agreed on cross-examination that "in the client's mind they are purchasing something before they ever meet [a lawyer], or call [a lawyer], or have anything to do with [a lawyer]." Indeed, Sharp thanked customers for wisely choosing a living trust at the same time Sharp advised of respondent's impending review of their personal and financial information.

{¶ 24} The board also observed that although Sharp sales representatives had no ethical responsibility to act in the best interests of respondent's clients, the representatives had total discretion during client appointments as to whether the representative would answer a legal question or refer it to respondent. Senter reported having had client meetings during which he never called respondent for advice. And though the representatives were laypersons, Senter admitted that

their sales presentations were founded upon documents containing legal terms and relationships—i.e., fiduciary and durable power of attorney.

{¶ 25} The board found a DR 3–101(A) violation because respondent facilitated Sharp's use of nonattorneys to market estate plans, including living trusts, in a way that encompassed the unlicensed practice of law. *Columbus Bar Assn. v. Fishman,* 98 Ohio St.3d 172, 2002-Ohio-7086, 781 N.E.2d 204, *Columbus Bar Assn. v. Moreland,* 97 Ohio St.3d 492, 2002-Ohio-6726, 780 N.E.2d 579, and *Cincinnati Bar Assn. v. Kathman* (2001), 92 Ohio St.3d 92, 748 N.E.2d 1091, also involved lawyers participating in the sale of living trusts, and all disapproved of this practice. *Kathman* even implicated The Estate Plan, which provided many of the same services that respondent used in this case. As we stated in *Kathman*:

{¶ 26} "Respondent did little more than advise clients that he was entitled to a fee and then direct The Estate Plan to draft the living trust documents. Respondent did not see the final trust documents, did not execute the documents with the client, and certainly did not render the type of advice or counsel that a lawyer is ethically bound to render." Id. at 98, 748 N.E.2d 1091.

*DR 2–103(C)*

{¶ 27} For the most part, Sharp representatives referred customers only to respondent. To facilitate the referrals and at Sharp's request, respondent provided Sharp a supply of business cards and biographical information. Respondent is not certified as a specialist in any legal subject area. The biographical summary Sharp provided to customers, however, impermissibly described respondent as specializing in "Wills & Estate Planning, Probate, Living Trusts, Family Law, Deed Preparations, Real Estate." He was also represented to be "one of the finest Estate Planning Attorneys in the State of Ohio."

{¶ 28} After his deposition in the unauthorized-practice-of-law case lodged against Sharp, respondent began to reconsider their arrangement, and approximately six months later, he disassociated himself. According to respondent's wife, "[Respondent] was keeping a very close eye on Mr. Sharp based on the June 2001 deposition. And the more we watched him, the more we learned, the more concerned we became * * * [and] we also found out in November that he had not filed taxes for years. And we just decided that that was not a person we wanted to continue working with."

{¶ 29} Respondent has since entered a referral arrangement with National. Respondent insists that National is reputable and does not engage in the unauthorized practice of law. Relator does not assert that respondent's relationship with National involves misconduct.

{¶ 30} The board found a DR 2–103(C) violation because respondent knowingly allowed Sharp's nonlawyer sales agents to exclusively promote his legal services and to use a document that made improper representations about his qualifications. Quoting *Fishman*, 98 Ohio St.3d 172, 2002-Ohio-7086, 781 N.E.2d 204, ¶ 12, in which another violation of this rule occurred, the board explained:

{¶ 31} " 'Respondent unquestionably violated DR 2–103(C). He contracted with an organization that independently targeted and solicited prospects for his representation, dispatched personnel to offer that representation, and then paid itself, respondent, and the personnel for their services. Despite respondent's arguments to the contrary, this was not a lawyer's accepting employment in response to his own advertising, notwithstanding any compliance with more content-oriented rules on the subject.' " (Emphasis deleted.)

### Sanction

{¶ 32} In recommending a sanction for respondent's misconduct, the board reviewed the aggravating and mitigating factors of respondent's case. See Section 10 of the Rules and Regulations Governing Procedure on Complaints and Hearings Before the Board of Commissioners on Grievances and Discipline ("BCGD Proc.Reg."). In mitigation, the board found that respondent does not have a prior disciplinary record and cooperated in the disciplinary process. BCGD Proc.Reg. 10(B)(2)(a) and (d). The board also found that respondent had not acted with a dishonest or selfish motive, although he did receive $150 from each of Sharp's referrals. BCGD Proc.Reg. 10(B)(2)(b). Moreover, Senter, a longtime friend of respondent's, testified that respondent has an excellent professional reputation in their community and has been active for many years in church and the Boy Scouts. BCGD Proc.Reg. 10(B)(2)(e).

{¶ 33} In aggravation, the board noted respondent's difficulty in recognizing the conflict-of-interest issues inherent in affiliating with organizations like The Estate Plan and Sharp. BCGD Proc.Reg. 10(B)(1)(g). Respondent disassociated from Sharp after learning of the unauthorized-practice-of-law case against the company; however, he waited several months before ending their financial arrangement. The board observed that if respondent had represented his clients as ethically required, he would have realized much sooner that he was helping Sharp profit from his clients. Moreover, although respondent reports that only one client has complained thus far about respondent's misconduct, there are approximately 900 elderly clients who may now be under the false impression that the interests of their estates have been properly safeguarded. BCGD Proc.Reg. 10(B)(1)(h).

{¶ 34} Relator urged the board to suspend respondent's license to practice for one year, the sanction imposed in *Fishman*, 98 Ohio St.3d 172, 2002-Ohio-7086, 781 N.E.2d 204, ¶ 21, because, in addition to the misconduct committed by

respondent, the lawyer in *Fishman* failed to reasonably protect client confidences in violation of DR 4–101(D), commingled client funds in violation of DR 9–102(A), and failed to render appropriate accounts in violation of DR 9–102(B)(3). Respondent advocated a public reprimand, citing the sanction imposed in *Moreland*, 97 Ohio St.3d 492, 2002-Ohio-6726, 780 N.E.2d 579, ¶ 17, in which the lawyer stipulated to violations of DR 2–101(A) (regulating the propriety of advertising, including direct mail solicitations), 3–101(A), and 3–102(A) and presented significant evidence of mitigation. The board reasoned that respondent's misconduct warranted a less onerous sanction than the six-month suspension imposed in *Kathman*, 92 Ohio St.3d 92, 748 N.E.2d 1091, in which the lawyer violated DR 2–102(B) (regulating the practice of law under a trade name), 3–101(A), 3–102(A), and 5–107(B) (prohibiting a lawyer from allowing his professional judgment on behalf of a client to be influenced because someone else is paying for the lawyer's services). The board thus recommended, consistent with the panel's suggestion, that respondent be suspended from the practice of law for six months, all stayed.

Review

{¶ 35} We agree that respondent violated DR 3–102(A), 2–103(C), and 3–101(A), as found by the board. Because this case is nearly identical to *Kathman*, however, we impose a six-month suspension and stay none of it.

{¶ 36} As the board noted, conflict issues arise when attorneys affiliate themselves with nonlawyers who sell trusts. "[T]he attorney's interests are divided between working for or receiving referrals from the nonattorney, and attempting to represent the nonattorney's clients." *Kathman*, 92 Ohio St.3d at 96, 748 N.E.2d 1091. The fact that an attorney may review trust documents prepared by nonattorneys, such as The Estate Plan, "does not cure and, in fact, aids the unauthorized practice of law by the nonattorney." Id. at 97, 748 N.E.2d 1091. We identified the following problem:

{¶ 37} "[T]he review attorney enters the relationship too late—the nonattorney has already given legal advice to the client regarding the client's legal matters, has gathered important information, and has recommended and sold a trust instrument. * * * In the eyes of the public, the review attorney lends credibility and a facade of legality to the product the nonattorney offers, but the attorney does not make the critical decisions necessary for the creation of the trust or provide disinterested advice. * * * By the time the attorney enters the transaction, the unauthorized practice of law has already occurred and anything the attorney does thereafter aids the prohibited conduct." Id.

{¶ 38} *Kathman*'s reasoning applies with equal force here. The Sharp sales presentation occurred before respondent or his office had any contact with clients, and the sales pitch necessarily included the legal advice that a living trust is always in a customer's best interest. Respondent aided in the unauthorized

practice of law by entering into an exclusive referral arrangement with Sharp, by preparing living trusts that relied upon client information and choices obtained by nonlawyers, and by using The Estate Plan's boilerplate forms, language, and software.

{¶ 39} Because respondent did not readily acknowledge the established impropriety of his misconduct, the public reprimand in *Moreland* is not appropriate. Respondent, who is again affiliated with a vendor of living trusts, still fails to grasp how he compromised his clients by leaving them to plan their estates from the presentation of one or more laypersons. On the other hand, respondent did not consciously set up his clients, as happened in *Fishman,* for sales presentations of insurance products after the first meeting with a Sharp representative and thereby further compromise their confidences.

{¶ 40} Respondent is hereby suspended from the practice of law in Ohio for six months. Costs are taxed to respondent.

Judgment accordingly.

MOYER, C.J., RESNICK, PFEIFER, LUNDBERG STRATTON, O'CONNOR, O'DONNELL and LANZINGER, JJ., concur.

---

Jonathan E. Coughlan, Disciplinary Counsel, and Brian E. Shinn, Assistant Disciplinary Counsel, for relator.

Janik & Dorman, L.L.P., Jonathan W. Philipp, and Toni M. Richmond, for respondent.