DISCIPLINARY COUNSEL *v.* KRAMER.

[Cite as *Disciplinary Counsel v. Kramer,*
113 Ohio St.3d 455, 2007-Ohio-2340.]

(No. 2006–2332—Submitted February 14, 2007—Decided May 30, 2007.)

**Per Curiam.**

{¶ 1} This court admitted respondent, Lawrence Joseph Kramer Jr. of Cleveland Heights, Ohio, Attorney Registration No. 0076893, to the practice of law in Ohio in 2003. The Board of Commissioners on Grievances and Discipline now recommends that we suspend respondent's license to practice for six months, staying the entire suspension on conditions, because he committed professional misconduct while associated with a company that sold insurance and services related to living trusts to his clients. On review, we find that a stayed six-month suspension is appropriate for respondent's violations of the Code of Professional Responsibility.

{¶ 2} Relator, Disciplinary Counsel, charged that respondent's affiliation with CLA USA, Inc. ("CLA"), a Texas corporation in business to market and sell insurance, violated DR 2–103(C) (prohibiting a lawyer from engaging a person or organization to promote the lawyer's professional services, except to the extent permitted by a lawyer referral service), 3–101(A) (prohibiting a lawyer from aiding a nonlawyer in the unauthorized practice of law), and 5–107(B) (prohibiting a lawyer from permitting a person who recommends, employs, or pays him or her to provide legal services for another to control his professional judgment). A three-member panel of board members heard the cause, including the parties' comprehensive stipulations, found violations of DR 2–103(C) and 3–101(A), and recommended that respondent receive a six-month stayed suspension. The board adopted the panel's findings of misconduct and recommendation.

{¶ 3} Neither party objects to the board's report.

### Misconduct

{¶ 4} A lawyer must exercise professional judgment within the bounds of the law and "solely for the benefit of his client and free of compromising influences and loyalties." EC 5–1. But we have repeatedly seen lawyers run afoul of ethical standards by participating in sales transactions through which companies offer living-trust agreements, usually targeting older customers, and then profit by also selling insurance. See, e.g., *Disciplinary Counsel v. Wheatley*, 107 Ohio St.3d 224, 2005-Ohio-6266, 837 N.E.2d 1188; *Columbus Bar Assn. v. Fishman*, 98 Ohio St.3d 172, 2002-Ohio-7086, 781 N.E.2d 204; *Columbus Bar Assn. v. Moreland*, 97 Ohio St.3d 492, 2002-Ohio-6726, 780 N.E.2d 579; and *Cincinnati Bar Assn. v. Kathman* (2001), 92 Ohio St.3d 92, 748 N.E.2d 1091. These affiliations necessarily dilute the independence of a lawyer's counsel because, from the

earliest possible moment, the company's sales objectives, not the client's individual interests, drive the outcome of the transaction. Id. at 97–98, 748 N.E.2d 1091; *Fishman* at ¶ 14.

{¶ 5} Respondent's affiliation with CLA, which conducted business in much the same way as did the marketing companies in the cited cases, suffered from some of the same infirmities. CLA first solicited potential customers though mass mailings and group seminars, touting the benefits of establishing a living trust. Nonlawyer-agents of CLA then arranged follow-up appointments to obtain customers' financial information and to finalize sales, execute the sales contracts, and collect the fees for CLA's services. If a customer did not have a lawyer, the CLA agent also provided a list of licensed Ohio lawyers available for referral, and the customer-turned-client typically signed an agreement to retain one and wrote the lawyer a check for a legal fee. After the lawyer completed the documents to open the trust, an unlicensed CLA agent arranged a meeting for the customer-client to execute the documents. At this point, the agent advised the customer how to fund the trusts, providing financial and estate-planning advice and recommending the purchase of various insurance contracts for which the agent would be paid a commission.

{¶ 6} From October 2003 to July 2004, before and after his admission to the Ohio bar, respondent worked for CLA, delivering legal documents to CLA's customers for execution and selling them insurance. He also performed annual reviews of CLA's customers, checking each year to make sure customers' trusts were properly funded and to see whether he could sell them more insurance. CLA paid respondent $75 for a meeting for initial execution of trust documents, $25 per annual review, and commissions on the insurance that he sold.

{¶ 7} In January 2004, CLA hired respondent as a regional manager. As manager, respondent supervised and trained CLA agents to deliver documents for execution and perform annual reviews in seven states, including Ohio. CLA paid respondent a salary and a percentage of commissions earned on insurance sales. Respondent left CLA in July 2004 to open his own legal practice.

{¶ 8} Respondent soon started accepting CLA client referrals in his practice. He provided the company a form letter with his biographical information and a retainer agreement for CLA agents to give interested customers. In accordance with the CLA referral process, the CLA agent collected $350 checks from each referred customer and then sent respondent the checks and the signed retainer agreements. Beginning in July 2004, respondent received packets each week containing CLA retainer checks.

{¶ 9} After a referral, respondent personally accessed his client's financial information from CLA's website and prepared typical documents, including revocable living trusts, pour-over wills, various deeds, durable powers of attorney, healthcare powers of attorney, and guardianship declarations. Respondent then

contacted the client, generally by telephone, to initially review his work. By the time respondent finally consulted his client, however, CLA agents had already convinced the client to buy, and the client had already paid for, services to be generated by the anticipated living trust.

{¶ 10} Respondent returned completed trust documents to CLA to arrange for his clients to sign. Respondent fully realized that in obtaining the client's signature, a CLA agent would also present an insurance sales pitch, and consistent with his previous experience as a CLA agent, respondent encouraged this solicitation. Respondent never attended any of the meetings at which his clients executed the legal documents that he had prepared, nor did he routinely follow up with the clients afterward.

{¶ 11} Respondent continued to receive referrals from CLA until September 2005, when he ended their affiliation. Until then, respondent's practice had consisted mainly of CLA referrals. Between July 2004 and the time of his October 17, 2005 deposition, respondent had had 251 clients, 221 of which CLA had referred, and he drew roughly 72 percent of his income from these referrals. Respondent prepared living trusts for the "vast majority" of these clients, and afterward, only one of them ever retained him to do other work.

DR 2–103(C)—Promotional Improprieties

{¶ 12} As the board found, respondent provided form letters and retainer agreements so that CLA agents could recommend his services to clients with whom he had no other connection. For example, Margaret Chamlis reported that she had no contact at all with respondent after paying a CLA agent $2,145 for setting up a living trust, signing one of respondent's retainer contracts, and writing respondent a $350 check. Chamlis ultimately reconsidered her decision and received a full refund from CLA; however, she still filed a grievance, and only then did respondent learn that she had been a "client."

{¶ 13} We have specifically disapproved of this practice. In *Wheatley*, 107 Ohio St.3d 224, 2005-Ohio-6266, 837 N.E.2d 1188, ¶ 31, quoting *Fishman*, 98 Ohio St.3d 172, 2002-Ohio-7086, 781 N.E.2d 204, ¶ 12, we admonished:

{¶ 14} " 'Respondent unquestionably violated DR 2–103(C). He contracted with an organization that independently targeted and solicited prospects for his representation, dispatched personnel to offer that representation, and then paid itself, respondent, and the personnel for their services. Despite respondent's arguments to the contrary, this was not a lawyer's accepting employment in response to his own advertising * * *.' "

{¶ 15} We therefore agree that respondent violated DR 2–103(C).

DR 3–101(A)—Aiding the Unauthorized Practice of Law

{¶ 16} As the board found from Chamlis's sworn statement, the unlicensed CLA agent who visited her described the probate process, estate tax ramifica-

tions, and strategies for avoiding probate, all with the goal of persuading her to establish a living trust and use CLA's services to do it. The agent's written materials provided specific advice as to the "benefits of a living trust" and answers to "most often asked questions," including how the probate process works, the disadvantages of probate, how to legally avoid probate, and how a living trust can be used to avoid estate and inheritance taxes. The sales presentations focused on living trusts because nearly every CLA service depended on the customer's having a living trust.

{¶ 17} In *Cleveland Bar Assn. v. Sharp Estate Serv.*, 107 Ohio St.3d 219, 2005-Ohio-6267, 837 N.E.2d 1183, ¶ 8, we resolved that sales agents who explained the legal consequences of specific decisions relating to living trusts or estate plans had practiced law without a license, inasmuch as the agents had advised other persons how to best secure their legal rights. Accord *Fishman*, 98 Ohio St.3d 172, 2002-Ohio-7086, 781 N.E.2d 204, ¶ 15, and *Kathman*, 92 Ohio St.3d 92, 96, 748 N.E.2d 1091. Thus, even respondent conceded that if a CLA agent had advised Chamlis that she needed a living trust, the agent had engaged in the unauthorized practiced law.

{¶ 18} According to Karen Hamilton, another former CLA referral attorney, the CLA agents also had little if any professional supervision during their presentations. CLA instructed agents to ask a referral lawyer to answer a customer's legal questions, and Hamilton and respondent had each received calls on occasion from agents making a sales pitch. Both attorneys, however, confirmed that the agents called infrequently, and Hamilton reported that the sales generally took place without any attorney's counsel.

{¶ 19} Respondent did not fundamentally disagree with this assessment of the CLA customer's experience. In his defense, however, respondent recounted the work that he personally performed on a client's behalf—he actually prepared all legal documents for each client, and he consulted with each client about the significance of the documents in 45– to 90–minute sessions. Respondent also cites the times that he dissuaded clients from establishing living trusts because the arrangement did not serve the clients' financial interests.

{¶ 20} That respondent in reality exercised his independent professional judgment and expertise for his clients' protection distinguishes this case from *Kathman*, 92 Ohio St.3d at 94, 748 N.E.2d 1091, in which the lawyer merely facilitated the process through which lay personnel filled in the blanks on boilerplate forms made available by the marketing company. Respondent's work also distinguishes his case from *Fishman*, 98 Ohio St.3d 172, 2002-Ohio-7086, 781 N.E.2d 204, ¶ 7, in which the lawyer superficially reviewed lay personnel in performing the same ministerial function. We therefore agree with the board

that respondent did not violate DR 5–107(B) by allowing his association with CLA to influence his judgment on behalf of his clients.

{¶ 21} But respondent also unquestionably aided CLA in the unauthorized practice of law. By accepting referrals from lay persons who had already convinced the client to purchase a living trust, respondent entered the relationship with his client too late. As we explained in *Kathman*, 92 Ohio St.3d at 97, 748 N.E.2d 1091:

{¶ 22} "[T]he nonattorney has already given legal advice to the client regarding the client's legal matters, has gathered important information, and has recommended and sold a trust instrument. * * * In the eyes of the public, the review attorney lends credibility and a facade of legality to the product the nonattorney offers, but the attorney does not make the critical decisions necessary for the creation of the trust or provide disinterested advice. * * * By the time the attorney enters the transaction, the unauthorized practice of law has already occurred and anything the attorney does thereafter aids the prohibited conduct."

{¶ 23} We therefore also agree that respondent violated DR 3–101(A).

### Sanction

{¶ 24} Respondent now understands the impropriety of his association with CLA. Moreover, respondent has no prior disciplinary violations, he has cooperated fully in these disciplinary proceedings, and he has established his good character and reputation apart from his affiliation with CLA, all of which militate against a severe sanction. See Section 10(B)(2)(a), (d), and (e) of the Rules and Regulations Governing Procedure on Complaints and Hearings Before the Board of Commissioners on Grievances and Discipline. Taking these factors into account, the board recommended a six-month suspension of respondent's license, all stayed.

{¶ 25} The recommended sanction is within the range of sanctions we have previously imposed for similar misconduct, see, e.g., *Moreland*, 97 Ohio St.3d 492, 2002-Ohio-6726, 780 N.E.2d 579 (public reprimand), *Wheatley*, 107 Ohio St.3d 224, 2005-Ohio-6266, 837 N.E.2d 1188 (six-month actual suspension), and *Kathman*, 92 Ohio St.3d 92, 748 N.E.2d 1091 (six-month actual suspension), and respondent has not objected to it. We therefore suspend respondent from the practice of law in Ohio for six months, but stay the suspension on the condition that respondent commits no further misconduct. If respondent violates the condition of the stay, the stay will be lifted and respondent shall serve the entire six-month suspension.

{¶ 26} Costs are taxed to respondent.

Judgment accordingly.

MOYER, C.J., LUNDBERG STRATTON, O'CONNOR, O'DONNELL, LANZINGER and CUPP, JJ., concur.

PFEIFER, J., dissents and would suspend respondent from the practice of law in Ohio for six months.

_____

Jonathan E. Coughlan, Disciplinary Counsel, and Brian E. Shinn, Assistant Disciplinary Counsel, for relator.

Kim Roberts & Steiger, L.L.C., William E. Steiger II, and Jacqueline I. Roberts, for respondent.