CINCINNATI BAR ASSOCIATION *v*. MULLANEY.

CINCINNATI BAR ASSOCIATION *v*. BROOKING.

CINCINNATI BAR ASSOCIATION *v*. MOEVES.

[Cite as *Cincinnati Bar Assn. v. Mullaney*,
119 Ohio St.3d 412, 2008-Ohio-4541.]

(No. 2008–0412—Submitted April 23, 2008—Decided September 16, 2008.)

**Per Curiam.**

{¶ 1} We must determine in this case the appropriate sanction for each of three lawyers who, in accepting customers of Foreclosure Solutions, L.L.C., as clients, committed professional misconduct, including aiding the unauthorized practice of law, improperly sharing legal fees with nonlawyers, and failing to seek lawful objectives of clients by failing to assess their individual needs. Finding that these acts and others violated the Code of Professional Responsibility, the Board of Commissioners on Grievances and Discipline recommends that we publicly reprimand one of the lawyers, order a one-year, conditionally stayed suspension of the second lawyer's Ohio license, and enjoin the third lawyer from practicing pro hac vice in this state for two years. We accept the board's findings of misconduct and recommendation.

{¶ 2} Respondent Darren Joseph Mullaney of Cincinnati, Ohio, Attorney Registration No. 0075929, was admitted to the practice of law in Ohio in 2003. Respondent John S. Brooking of Fort Wright, Kentucky, Attorney Registration No. 0055654, was admitted to the Ohio bar in 1991 and is also admitted in Kentucky. Respondent Patrick F. Moeves of Fort Wright is admitted to the practice of law in Kentucky and has been admitted to practice pro hac vice in a number of Ohio courts.

{¶ 3} Relator, Cincinnati Bar Association, charged respondents in three separate complaints with various violations of the Disciplinary Rules. A three-member panel of the board heard the cases during consolidated proceedings on three days in December 2007 and then found that respondents had committed misconduct warranting sanctions of varying severity. The board adopted the findings of misconduct and recommendations for a public reprimand (Mullaney), stayed one-year suspension (Brooking), and injunction against pro hac vice practice (Moeves).

{¶ 4} The parties have not objected to the board report.

## I. Misconduct

### A. Introduction

{¶ 5} Respondents Brooking and Moeves are principals in Brooking, Moeves & Halloran, P.L.L.C. ("the Brooking firm"), a law firm established in September 2004 and located in Fort Wright, Kentucky. Respondent Mullaney was employed as an associate of the Brooking firm and its predecessors, Moeves & Associates, P.L.L.C., and Moeves & Halloran, P.L.L.C., from May 2004 until May 2006. Foreclosure Solutions, L.L.C., is a company located in Ohio that purports to serve homeowners threatened with foreclosure by helping them set up a savings plan, so that after the homeowners follow the plan, Foreclosure Solutions can use the money saved to negotiate with the lenders to reinstate the loan and avoid foreclosure.

{¶ 6} In 2003, Moeves, then a principal in the law firm of Moeves & Associates, P.L.L.C., worked out a deal with Timothy Buckley, president of Foreclosure Solutions, agreeing to represent Foreclosure Solutions' customers in Kentucky courts. Pursuant to their agreement, Moeves began accepting clients from Foreclosure Solutions, who routinely obtained a limited power of attorney to hire an attorney for its customers, and Moeves collected a flat fee from Foreclosure Solutions of $125 for each client. With the formation of the Brooking firm in the fall of 2004, Moeves and Buckley extended their agreement to include representation of Foreclosure Solutions' customers in Ohio courts.

### B. The Foreclosure Solutions System

{¶ 7} Foreclosure Solutions' customers paid between $700 and $1,100 for the company's services, the goal of which was to stall pending foreclosure proceedings while trying to negotiate a settlement with the lender. The company is not a licensed or accredited consumer-credit-counseling agency. Nor is Buckley or any of his employees, to the respondents' knowledge, licensed to practice law in any jurisdiction.

{¶ 8} Foreclosure Solutions advertised to attract customers and often sent advertisements to defendants listed on court foreclosure dockets. Agents of the

company told prospective customers that an attorney and legal services would be furnished to them as part of their fee. The company then hired a lawyer for the customer-client to respond in court to the recently filed foreclosure action. The client had no choice in the lawyer's selection, and after the lawyer was hired, Foreclosure Solutions' agents continued to negotiate directly with the foreclosing creditors.

{¶ 9} Foreclosure Solutions' agents met with customers to collect the company's fee and had the customer sign a standardized contract, the "Work Agreement," containing the basic terms and conditions of the engagement. The agent also had the customer sign a standardized limited power of attorney appointing Foreclosure Solutions as the customer's attorney-in-fact, which, in addition to authorizing the hiring of an attorney, allowed company agents to negotiate on the customer's behalf with creditors. Neither the Work Agreement nor the limited power of attorney identified any particular lawyer, established when a lawyer was to be hired, or informed the client of the amount of the lawyer's fee.

{¶ 10} As the solution to a customer's foreclosure troubles, the Work Agreement provided for the customer to set up a savings account and deposit a certain amount of money into it on a regular basis; Foreclosure Solutions would then use that money as a bargaining chip in negotiations with the creditor. Foreclosure Solutions determined the amount the client was to periodically deposit in the savings account. The Work Agreement specified that bankruptcy was considered a last resort.

{¶ 11} Once the Foreclosure Solutions customer had signed the Work Agreement and limited power of attorney, the agent completed a financial worksheet and determined the savings recommendation. The agent then collected Foreclosure Solutions' fee, none of which was designated as attorney fees. From this $700 to $1,100 fee, Foreclosure Solutions paid the lawyers their flat fee.

*C. The Brooking Firm's Representation of Foreclosure Solutions Customers*

{¶ 12} Under the arrangement with Foreclosure Solutions, the Brooking firm represented approximately 2,000 clients in Ohio foreclosure proceedings during 2005 and 2006, at first accepting $125 and later $150 for each case. Among these clients were Richard and Karen Godfrey, who filed a grievance with relator, Fred Grant, Valerie Johnson, Dorene Brown, Rick Dorn, Roger Porter, William Armitage, Shelia Keyes, Lorrinzo Wimberly, Martiese Head, Roberta and Frederick Warr, Michael Zaback, Annie Crowell, Thomas and Michelle Sambor, and Mark Stoves. Mullaney represented all these clients except Dorn and Stoves.

{¶ 13} Brooking represented Foreclosure Solutions' customers during the spring and summer of 2006, after Mullaney left the firm, and then again beginning in September of that year, after the lawyer who had replaced Mullaney left the firm. Between the two of them, Mullaney and Brooking defended clients

against foreclosure in the common pleas courts of Hamilton, Butler, Clermont, Cuyahoga, Montgomery, Union, Van Wert, Auglaize, Franklin, Greene, Lucas, Stark, Trumbull, Muskingum, Perry, Mercer, Lorain, and Summit Counties, among others. After courts granted his motions to appear pro hac vice, Moeves handled numerous foreclosure cases in Cuyahoga, Hamilton, Stark, Summit, Portage, Defiance, Van Wert, Sandusky, and Butler Counties.

{¶ 14} Respondents did not oversee solicitations or have any other involvement with Foreclosure Solutions' customers before the company sent its customers' files to the Brooking firm. When received by the firm, the files typically contained the Work Agreement, the limited power of attorney, an intake sheet that had been completed by a Foreclosure Solutions' agent, and a copy of the complaint in foreclosure. The intake sheet, another standardized form, contained the client's financial information. The Brooking firm often received several client files at a time, together with one check for all the fees.

{¶ 15} When it accepted a new case, the Brooking firm routinely sent the client an informational brochure entitled "The Nuts and Bolts of an Ohio Foreclosure" that Moeves and Mullaney had prepared. As the foreclosure actions went forward, Mullaney, Brooking, or Moeves responded in court with standardized pleadings and other filings, sending copies to the clients. Cases rarely if ever went to trial, and if the parties could not negotiate a resolution, trial courts granted judgment to the lenders and ordered the sale of the property. At that time, Mullaney, Brooking, or Moeves notified the client of the sale date and sent a standardized letter recommending that the client contact a bankruptcy lawyer.

{¶ 16} Mullaney, Brooking, and Moeves realized that when Foreclosure Solutions was successful in its solicitation of customers, Foreclosure Solutions, rather than the customers themselves, hired the Brooking firm to represent the customers in their pending foreclosure actions. The respondents also realized that their clients were not told in any of the Foreclosure Solutions paperwork the portion of the fee that would go toward legal fees. Moreover, Mullaney, Brooking, and Moeves knew that Foreclosure Solutions' agents were continuing to negotiate with lenders on their customers' behalf while the Brooking firm represented the customers as clients.

{¶ 17} In following its typical procedure, the Brooking firm lawyers did not as a rule meet with the Foreclosure Solutions clients to determine their particular objectives or complete financial situation or to discover facts that could be defenses to foreclosure. The lawyers generally communicated with the clients through boilerplate correspondence, which the lawyers had no indication that the clients understood. As an example, one standard Brooking firm letter asked whether the client knew of any defenses to the foreclosure, relying on the client to guess what factors might be useful in his or her case.

{¶ 18} In this way, Mullaney, Brooking, and Moeves failed to determine what action, including filing bankruptcy immediately, was in any one particular client's best interest. Respondents instead simply followed the Foreclosure Solutions "savings plan" strategy and allowed the foreclosure action to proceed until either a settlement could be negotiated with the lender or the court granted judgment in favor of the lender and ordered the property to be sold, with the lawyers filing routine pleadings and motions at critical stages to delay the process. Only when a sale was imminent did Mullaney, Brooking, and Moeves advise the clients to consider another remedy by contacting a bankruptcy attorney.

### D. Disciplinary Rule Violations

{¶ 19} In restricting a lawyer's use of referral services to those that serve the public interest and otherwise comply with the rule, DR 2–103(C) prohibits lawyers from using "a person or organization to recommend or promote the use of the lawyer's services or those of the lawyer's partner or associate, or any other lawyer affiliated with the lawyer or the lawyer's firm, as a private practitioner." Foreclosure Solutions is not a referral service as described by the rule, yet Mullaney, Brooking, and Moeves accepted clients from that company. We therefore find that respondents violated DR 2–103(C).

{¶ 20} DR 3–101(A) prohibits lawyers from aiding nonlawyers in the unauthorized practice of law. We have held that by advising debtors of their legal rights and the terms and conditions of settlement in negotiations to avoid pending foreclosure proceedings, laypersons engage in the unauthorized practice of law. *Cincinnati Bar Assn. v. Telford* (1999), 85 Ohio St.3d 111, 707 N.E.2d 462. Here, Mullaney, Brooking, and Moeves facilitated nonlawyers' negotiations with the creditors of debtors facing foreclosure by doing business with Foreclosure Solutions. We therefore find that respondents violated DR 3–101(A).

{¶ 21} Except in circumstances not relevant here, DR 3–102(A) prohibits lawyers from sharing legal fees with nonlawyers. By accepting a portion of the compensation that the customers paid Foreclosure Solutions for legal services, Mullaney, Brooking, and Moeves shared legal fees with nonlawyers. We therefore find that respondents violated DR 3–102(A).

{¶ 22} DR 3–103(A) prohibits a lawyer from forming a partnership with a nonlawyer if any activities of the partnership consist of the practice of law. Brooking and Moeves, principals in the Brooking firm, partnered with Foreclosure Solutions in representing debtors facing foreclosure. We therefore find that these two respondents violated DR 3–103(A).

{¶ 23} DR 6–101(A)(2) prohibits a lawyer from handling a legal matter without preparation adequate under the circumstances. DR 7–101(A)(1) prohibits a lawyer from intentionally failing to seek a client's lawful objectives. These rules

prohibited Mullaney, Brooking, and Moeves from surrendering their professional judgment to Foreclosure Solutions.

{¶ 24} Counseling debtors in financial crisis as to their best course of legal action requires the attention of a qualified attorney. *Columbus Bar Assn. v. Flanagan* (1997), 77 Ohio St.3d 381, 383, 674 N.E.2d 681. Expert testimony in this case discredited respondents' approach to their foreclosure clients' cases. John Rose, an experienced bankruptcy attorney, explained a few of the adverse consequences that the tactics used by Foreclosure Solutions and respondents could have.

{¶ 25} Rose first pointed out that stall tactics usually result in mounting arrearages for the debtor and increased legal fees for the creditor, lessening the debtor's chances of getting ahead financially and of reaching an agreement with the creditor. Moreover, delay in seeking bankruptcy relief may result in lost opportunities to obtain maximum relief. As one example, Rose mentioned the "910–day rule," which permits a debtor to return a vehicle purchased within 910 days of filing a bankruptcy petition to a lien-holder in full satisfaction of the debt owed on the vehicle. By returning the vehicle, Rose observed, the debtor is relieved of installment payments, which frees up those funds to help satisfy the foreclosure debt.

{¶ 26} Rose testified that he had reviewed the Godfreys' financial situation in preparation for his testimony and that he noticed that when the Godfreys were represented by the respondents, they were making a large monthly payment on a car that they had recently purchased. Rose testified that respondents should have considered the 910–day rule when evaluating the financial affairs, objectives, and relief available to the Godfreys. But in keeping with Brooking-firm practice, Mullaney did not explore this or any other legal remedy for the clients referred by Foreclosure Solutions. Rather than consider redirecting or depleting other available financial resources to avoid foreclosure on a client's property—borrowing from an IRA or 401(k), for example—respondents simply accepted the Foreclosure Solutions plan of having the client try to save money in the hope that the lender would agree to reinstate the loan.

{¶ 27} Mullaney, Brooking, and Moeves failed to evaluate their clients' situations and develop a strategy to meet their individualized needs, and instead stuck to Foreclosure Solutions' single strategy to obtain relief. By not investigating and evaluating each client's debts and assets and other potential resources in order to assess the opportunities presented by existing law, respondents were inadequately prepared to represent their clients and failed to seek the clients' lawful objectives. We therefore find that respondents violated DR 6–101(A)(2) and 7–101(A)(1).

## II. Sanctions

{¶ 28} When imposing sanctions for attorney misconduct, we consider relevant factors, including the duties violated and sanctions imposed in similar cases. *Stark Cty. Bar Assn. v. Buttacavoli*, 96 Ohio St.3d 424, 2002-Ohio-4743, 775 N.E.2d 818, ¶ 16. "Before making a final determination, we also weigh evidence of the aggravating and mitigating factors listed in Section 10 of the Rules and Regulations Governing Procedure on Complaints and Hearings Before the Board of Commissioners on Grievances and Discipline ('BCGD Proc.Reg.'). *Cleveland Bar Assn. v. Glatki* (2000), 88 Ohio St.3d 381, 384, 726 N.E.2d 993." *Disciplinary Counsel v. Broeren*, 115 Ohio St.3d 473, 2007-Ohio-5251, 875 N.E.2d 935, ¶ 21.

### A. Duties Violated and Similar Cases

{¶ 29} We have already discussed the various duties violated. Regarding similar cases, we find respondents' misconduct most analogous to that of attorneys sanctioned for providing legal services in affiliation with nonlawyers marketing living trusts and related products to consumers.

{¶ 30} We have disapproved of lawyers' affiliations with these ventures because they typically foster the improprieties presented here—unauthorized lawyer referrals, fee-sharing with nonlawyers, and aiding the unauthorized practice of law—with the result being an overriding failure to attend to clients' individualized needs and a surrender of the lawyer's professional judgment. As relator's counsel argued in closing:

{¶ 31} "Foreclosure Solutions touted that lawyers would work on a client's behalf. Clients were attracted to the prospect of getting a lawyer to represent them for the apparently modest fee charged by Foreclosure Solutions.

{¶ 32} "But, nonetheless, before the Respondents' first contact with their client, a number of things had already been decided with no input from the law firm at all.

{¶ 33} "First of all, Foreclosure Solutions had dictated that the solution to the client's foreclosure would be a savings plan. Foreclosure Solutions had determined the amount the customer would save each month.

{¶ 34} "Foreclosure Solutions had set the fee that the client would pay for these services. Foreclosure Solutions selected the attorney to represent the customer. Foreclosure Solutions and the law firm had agreed, in advance, what portion of the fee that the customer paid Foreclosure Solutions would be paid to the law firm.

{¶ 35} "Foreclosure Solutions had also dictated that bankruptcy would be a last resort to avoid foreclosure. In essence, the sole representation was determined by the client's agreement with Foreclosure Solutions before the law firm had any contact with the client whatsoever."

{¶ 36} In these situations, we have imposed sanctions ranging from a public reprimand to a one-year suspension from the practice of law. See, e.g., *Columbus Bar Assn. v. Moreland*, 97 Ohio St.3d 492, 2002-Ohio-6726, 780 N.E.2d 579 (public reprimand for violations of DR 3–101(A) and 3–102(A) and a third Disciplinary Rule prohibiting improper solicitation); *Disciplinary Counsel v. Kramer*, 113 Ohio St.3d 455, 2007-Ohio-2340, 866 N.E.2d 498 (six-month suspension, all conditionally stayed, for violations of DR 2–103(C) and 3–101(A)); *Cincinnati Bar Assn. v. Heisler*, 113 Ohio St.3d 447, 2007-Ohio-2338, 866 N.E.2d 490 (six-month stayed suspension for violations of DR 2–103(C), 3–101(A), and 3–102(A) and a Disciplinary Rule prohibiting practicing under a trade name); *Disciplinary Counsel v. Wheatley*, 107 Ohio St.3d 224, 2005-Ohio-6266, 837 N.E.2d 1188 (six-month actual suspension for violations of DR 2–103(C), 3–101(A), and 3–102(A), plus the lawyer's demonstrated inability to grasp the danger posed by these ethical breaches); *Cincinnati Bar Assn. v. Kathman* (2001), 92 Ohio St.3d 92, 748 N.E.2d 1091 (six-month actual suspension for violations of DR 3–101(A) and 3–102(A) and practicing under a trade name); and *Columbus Bar Assn. v. Fishman*, 98 Ohio St.3d 172, 2002-Ohio-7086, 781 N.E.2d 204 (one-year suspension for violations of DR 2–103(C), 3–101(A), and 3–102(A) and various Disciplinary Rules implicated by the lawyer's setting up clients as sales prospects for insurance agents). The sanctions recommended by the board for the respondents herein are commensurate with the sanctions imposed in these cases.

*B. Aggravating and Mitigating Factors*

{¶ 37} Several of the aggravating factors listed in BCGD Proc.Reg. 10(B)(1) are common to all the respondents in this case. Respondents engaged in a pattern of misconduct and committed multiple offenses. BCGD Proc.Reg. 10(B)(1)(c) and (d). The vulnerability of respondents' clients also weighs against these lawyers. BCGD Proc.Reg. 10(B)(1)(h). As the board, in adopting the panel's report, observed:

{¶ 38} "Many, if not all, of the clients harmed by the respondents' misconduct were * * * in desperate financial circumstances, about to lose their homes and vulnerable to purveyors of a scheme to save their homes and assets. Respondents' participation as lawyers lent an aspect of legitimacy to the sale of a plan of otherwise dubious value * * *."

{¶ 39} A number of mitigating factors are also common to all respondents. None of the respondents has a prior disciplinary record, BCGD Proc.Reg. 10(B)(2)(a); the Brooking firm stopped accepting Foreclosure Solutions clients shortly after relator filed the formal complaint, cf. BCGD Proc.Reg. 10(B)(1)(b); and respondents cooperated with disciplinary authorities and established their good character and reputation apart from their misconduct, BCGD Proc.Reg. 10(B)(2)(d) and (e).

{¶ 40} Because each disciplinary case is unique, we are not limited to the aggravating and mitigating factors specified in BCGD Proc.Reg. 10(B) but may take into account "all relevant factors" in determining what sanction to impose. In Mullaney's case, we find that though he is subject to sanction for his failure to comply with the cited Disciplinary Rules, he was also an inexperienced associate of the Brooking firm at the time of his misconduct. As a new attorney, Mullaney devoted many hours trying to assist the clients assigned to him; however, practices in place at the Brooking firm necessarily constrained his efforts. For his part in representing Foreclosure Solutions customers, a public reprimand is appropriate.

{¶ 41} Brooking, on the other hand, is a seasoned practitioner. His violation of the cited Disciplinary Rules and the associated aggravating factors warrant a more exacting sanction to ensure that he will not repeat his misconduct. For the public's protection, a one-year suspension of Brooking's license to practice, all stayed on the condition that he commit no further misconduct, is appropriate.

{¶ 42} Moeves is also a seasoned practitioner but is not admitted to the Ohio bar. Moeves entered into the agreement with Foreclosure Solutions and then put into place the practices that led to all the charges against him and the other respondents. For his integral role in this ill-advised undertaking, an injunction prohibiting his pro hac vice practice in this state for two years is appropriate.

*C. Disposition*

{¶ 43} Respondent Mullaney is publicly reprimanded for having violated DR 2–103(C), 3–101(A), 3–102(A), 6–101(A)(2), and 7–101(A)(1).

{¶ 44} For having violated DR 2–103(C), 3–101(A), 3–102(A), 3–103(A), 6–101(A)(2), and 7–101(A)(1), respondent Brooking is suspended from the practice of law in Ohio for one year; however, the suspension is stayed on the condition that he commit no further misconduct. If respondent Brooking violates this condition, the stay will be lifted and he will serve the entire one-year suspension.

{¶ 45} For having violated the same Disciplinary Rules that Brooking violated, respondent Moeves is enjoined from practicing law in Ohio, pro hac vice or in any other respect, for two years.

{¶ 46} Costs are taxed to respondents.

Judgment accordingly.

MOYER, C.J., and PFEIFER, LUNDBERG STRATTON, O'CONNOR, O'DONNELL, LANZINGER, and CUPP, JJ., concur.

---

John G. Slauson, Richard L. Creighton, and Rosemary D. Welsh, for relator.

John J. Mueller, L.L.C., and John J. Mueller, for respondent Darren J. Mullaney.

Kegler, Brown, Hill & Ritter Co., L.P.A., Geoffrey Stern, and Christopher J. Weber, for respondents Patrick E. Moeves and John S. Brooking.