COLUMBUS BAR ASSOCIATION *v*. FISHMAN.

[Cite as *Columbus Bar Assn. v. Fishman*, 98 Ohio St.3d 172, 2002-Ohio-7086.]

*Attorneys at law — Misconduct — One-year suspension — Improperly promoting professional services — Aiding nonlawyers in the unauthorized practice of law — Sharing legal fees with nonlawyers — Failing to reasonably protect client confidences — Commingling client funds with own funds in an out-of-state bank account — Failing to keep appropriate accounts.*

(No. 2002-1101 — Submitted November 13, 2002 — Decided December 26, 2002.)

ON CERTIFIED REPORT by the Board of Commissioners on Grievances and Discipline of the Supreme Court, No. 01-54.

————————————

**Per Curiam**.

{¶1}    Respondent, Andrew M. Fishman of Columbus, Ohio, Attorney Registration No. 0031290, was admitted to the Ohio bar in 1965.   Under a February 1998 contract with American Heritage Corporation ("AHC"), a Nevada corporation that sells fixed annuities, AHC and respondent marketed living trusts to elderly consumers.[1]   They also arranged for AHC-affiliated insurance agents to try to sell insurance to those who had purchased the living trust agreements.

{¶2}    Initially, AHC sent direct-mail solicitations to consumers based on a retirement-age-or-older demographic.   Respondent did not participate or exercise any authority in this process, although solicitations appeared to be correspondence from his office.   The solicitations suggested as an inducement that

---

1.      The events at issue in this case are only those occurring before January 1, 2001, after which AHC changed its operations and its relationship with respondent.

consumers would receive a free guide on how to avoid probate and save taxes by replying via an attached card. Returned cards were delivered to AHC offices, and AHC and respondent considered these replying consumers to be prospective clients.

{¶3} Upon receipt of reply cards, AHC representatives contacted these prospective clients and attempted to arrange personal interviews. Respondent played no role in the process of collecting reply cards and scheduling interviews. AHC representatives then interviewed clients, using a presentation based on materials prepared by AHC about hypothetical difficulties and costs associated with the probate process and the advantages of creating a living trust. In answering prospective clients' questions, interviewers were not supposed to express legal opinions and were to refer such questions to respondent. Respondent was available to clients by telephone after they had decided to engage his services; however, he did not attend interviews to oversee interviewers' remarks or representations.

{¶4} During some periods of the agreement between AHC and respondent, interviewers were compensated by AHC only if prospective clients agreed to retain respondent's services in preparing a living trust. During other periods, interviewers were compensated by AHC for six hours of work if a potential client engaged respondent's services and for one and one-half hours if the client did not, regardless of the actual time spent.

{¶5} If after their interview prospective clients decided to pay for preparation of a living trust, interviewers completed an information sheet and had the clients execute a fee and engagement agreement. Interviewers then collected, either at the interview or afterward, a fee of $1,695. In accordance with the interviewers' instruction, the clients made their checks payable to respondent, who later endorsed the checks as necessary, copied the paperwork to check it for completion, and forwarded the copied preparatory documents to AHC.

{¶6} AHC deposited, accounted for, and disbursed fees paid for the living trusts by using a California bank and without placing the funds in client trust accounts despite the fact that the trusts had not yet been prepared. And pursuant to the agreement between respondent and AHC, AHC personnel had signature authority to make deposits and withdrawals from accounts so that respondent's specific consent was not required. On more than one occasion, these accounts were overdrawn, and checks written by AHC personnel were initially dishonored, although the checks were later covered.

{¶7} After clients had paid their fee, AHC personnel or an affiliate prepared the clients' living trusts and forwarded the documents to respondent for his review. When approved, AHC assigned "delivery agents," usually licensed to sell insurance, to meet with clients and finalize the living trust paperwork. Delivery agents arranged for clients to execute their trusts, obtained documentation to transfer assets and fund the trusts, and took any other action to effectuate the trust. Prior to the delivery agent visits, respondent typically called clients to advise that the agent was a licensed insurance salesperson and to see whether the client had any objection to the visit. Working on commission, the agents delivering the final trust documentation attempted to sell annuities to these clients.

{¶8} For each living trust sold, AHC paid respondent $150 for his participation.

{¶9} On November 2, 2001, relator, Columbus Bar Association, filed an amended complaint charging respondent with various violations of the Code of Professional Responsibility. A panel of the Board of Commissioners on Grievances and Discipline heard the cause, and based on the parties' stipulations, testimony, and exhibits, found that, in engaging in the described marketing system, respondent had violated DR 2-103(C) (improperly using an organization or person to promote a lawyer's services), DR 3-101(A) (aiding a nonlawyer in

the unauthorized practice of law), 3-102(A) (sharing fees with a nonlawyer), 4-101(D) (failing to reasonably protect client confidences), 9-102(A) (failing to deposit client funds in an identifiable Ohio trust account), and 9-102(B)(3) (failing to render appropriate accounts).

{¶10} In recommending a sanction, the panel consulted the mitigating and aggravating considerations in Section 10 of the Rules and Regulations Governing Procedure on Complaints and Hearings Before the Board of Commissioners on Grievances and Discipline. The panel considered as mitigating factors character witnesses' descriptions of respondent's competence and integrity and that respondent has been a practicing lawyer for over thirty-five years without any previous findings of professional misconduct. The parties stipulated that respondent had cooperated completely in the disciplinary process. As aggravating factors, the panel considered respondent's misconduct to be more egregious than the living trust marketing scheme used by the attorney in *Cincinnati Bar Assn. v. Kathman* (2001), 92 Ohio St.3d 92, 748 N.E.2d 1091, and noted that respondent could see nothing unprofessional about his marketing tactics.

{¶11} The panel recommended that respondent be suspended from the practice of law in Ohio for one year. The board adopted the panel's findings of misconduct and recommendation. Because ample proof of the cited infractions exists in the record and because a one-year suspension is a commensurate sanction, we agree with the board.

{¶12} Respondent unquestionably violated DR 2-103(C). He contracted with an organization that independently targeted and solicited prospects for his representation, dispatched personnel to offer that representation, and then paid itself, respondent, and the personnel for their services. Despite respondent's arguments to the contrary, this was not a lawyer's accepting employment in

response to his *own* advertising, notwithstanding any compliance with more content-oriented rules on the subject.

{¶13} Respondent also insists that he sufficiently supervised lay AHC personnel through his client contact and documentary review and thereby did not violate DR 3-101(A). But he misses the point.

{¶14} To *counsel* a client, an attorney must advise only in accordance with the client's best interest and, consequently, after independent analysis has revealed what those interests are. Thus, it is not enough for an attorney to look over the shoulders of nonattorneys in a process through which clients are advised about and accede to a living trust. In that situation, the reviewing attorney enters the relationship too late—the nonattorney has already processed information for the client about his or her affairs and has generated a legal solution of which the client is already convinced. *Kathman*, 92 Ohio St.3d 92, 94, 748 N.E.2d 1091. Compound this scenario with the fact that the nonattorney has a financial stake in the legal solution, and there can be no real confidence in the attorney. The attorney's status as the client's personal, yet objective advocate has been sacrificed for the sake of the sale.

{¶15} It is manifest from the evidence in this case that AHC representatives not only explained legal principles relative to wills and trusts, they also manipulated these principles in directing prospective clients to *choose* living trusts. Such client consultation is, at its most elemental, the practice of law. *Disciplinary Counsel v. Willis*, 96 Ohio St.3d 142, 2002-Ohio-3614, 772 N.E.2d 625, at ¶ 3-8. Respondent therefore unquestionably also aided nonattorneys in the unauthorized practice of law.

{¶16} Respondent violated DR 4-101(D) by failing to reasonably protect his clients from the improper use of their confidences and secrets by associates and others whose services he engaged. Respondent facilitated the arrangement through which a client's private information was disseminated to insurance agents

whose primary purpose was to sell annuities on commission. He then obtained the client's permission to be solicited without first exercising any real independent judgment as to whether the solicitation was for the client's benefit. Again, despite respondent's arguments to the contrary, this practice is simply not analogous to the use of copier or courier services, as is practical and necessary, in furthering the best interests of the client.

{¶17} The remaining violations found by the board all relate to the financial side of respondent's business with AHC. The board concluded that respondent impermissibly shared fees with AHC, commingled unearned funds in an out-of-state bank account, and failed to properly account for client property. We concur that respondent committed this misconduct and quote the board's cogent explanation:

{¶18} "Respondent exercised little control over [AHC representatives] and their sales activities and * * * funds for these legal services were collected and funneled through bank accounts controlled by AHC. Prior to January 1, 2001, the process of depositing, accounting for and disbursing the funds received from the client for legal work to be accomplished in the future by Respondent was done by AHC in its offices outside Ohio using bank accounts outside of Ohio. The accounts used for these purposes were not IOLTA accounts, nor were they maintained as trust accounts. Individuals who [were] not attorneys and who [were] not directly employed by the Respondent, but with whom Respondent had contractual relationships, [had] signature authority over such accounts and [could] and [did] make deposits and withdrawals from these accounts without the direct knowledge or consent of Respondent. Accounts in which funds belonging to Respondent's clients [had] been deposited by AHC [were] overdrawn, and checks written on those accounts [were] dishonored."

{¶19} Having concluded that respondent violated DR 2-103(C), DR 3-101(A), 3-102(A), 4-101(D), 9-102(A), and 9-102(B)(3), we turn our review to

the recommended sanction. In *Kathman*, 92 Ohio St.3d 92, 748 N.E.2d 1091, we first addressed the issue of attorneys aiding nonattorneys in the sale or marketing of living trusts. In that case, we suspended the attorney from the practice of law for six months for participating in the business of marketing living trusts and thereby violating DR 3-102(A) and 3-101(A), among other Disciplinary Rules. And more recently, we imposed a public reprimand for similar misconduct based on the board's recommendation and significant evidence of mitigating circumstances. *Columbus Bar Assn. v. Moreland*, 97 Ohio St.3d 492, 2002-Ohio-6726, 780 N.E.2d 579.

{¶20} We agree that the misconduct here warrants a more severe sanction than in either *Kathman* or *Moreland.* Respondent abandoned his professional responsibility to protect his clients' best interests. But respondent went far beyond this. He surrendered to AHC his duty to keep separate and properly account for his clients' funds. Then, he set up his clients as sales prospects for insurance agents with no overriding commitment to their financial and personal security. Even the unseasoned attorney Moreland recognized this impropriety when confronted with it. Yet respondent remains oblivious to the full significance of his unprofessional conduct.

{¶21} For these reasons, we agree that respondent's misconduct deserves the sanction recommended by the board. Respondent is hereby suspended from the practice of law in Ohio for one year. Costs are taxed to respondent.

Judgment accordingly.

MOYER, C.J., DOUGLAS, RESNICK, F.E. SWEENEY COOK and LUNDBERG STRATTON, JJ., concur.

PFEIFER, J., dissents and would indefinitely suspend respondent.

_____

Wiles, Boyle, Burkholder & Bringardner and Michael L. Close; James K. Hunter III; John K. McManus; Bruce A. Campbell, Bar Counsel, and Jill M. Snitcher McQuain, Assistant Bar Counsel, for relator.

Kegler, Brown, Hill & Ritter, Geoffrey Stern and Christopher J. Weber, for respondent.

_____