COLUMBUS BAR ASSOCIATION *v.* WILLETTE.

[Cite as *Columbus Bar Assn. v. Willette,*
117 Ohio St.3d 433, 2008-Ohio-1198.]

(No. 2007–1195—Submitted November 6, 2007—Decided March 20, 2008.)

**Per Curiam.**

{¶ 1} Respondent, Philip Brian Willette of Pickerington, Ohio, Attorney Registration No. 0019940, was admitted to the Ohio bar in 1976. Relator, Columbus Bar Association, filed a complaint charging respondent with several violations of the Code of Professional Responsibility. Respondent answered the complaint, and a panel of the Board of Commissioners on Grievances and Discipline held a hearing. The panel made findings of fact, conclusions of law, and a recommendation, all of which the board adopted.

{¶ 2} The board recommends that we suspend respondent from the practice of law for one year, with six months of the suspension stayed. We adopt the board's findings of misconduct and recommended sanction.

### Misconduct

{¶ 3} In February 2004, respondent entered into a contract with Estate Planning Legal Services, P.C. ("EPLS"), a Michigan law firm, to market and sell living trusts and other estate-planning services in Ohio. Respondent's contract provided that EPLS would be respondent's sole and exclusive agent for marketing, sales, and preparing estate-planning packages. For any clients that EPLS referred to respondent, the contract required that he pay EPLS the lesser of $750 or 50 percent of the client's fee as a marketing and document-preparation fee. EPLS, however, prohibited respondent from offering any financial advice to his clients regarding the funding of the trust.

{¶ 4} EPLS used direct mail and telephone solicitations to contact prospective clients on respondent's behalf. These solicitations touted the benefits of living trusts over probate, claiming that the probate process was long and expensive, and promised to provide consumers information to avoid probate, unnecessary

fees, and estate taxes through the use of trusts. After contacting consumers, EPLS would refer them to respondent as potential clients and a meeting would be arranged.

{¶ 5} In 2004, Janice Tolbert, an EPLS telemarketer,[1] contacted Dr. B. Dale Trott and his wife, Betty. Respondent later contacted the Trotts and identified himself as the attorney following up on Tolbert's phone call. Thereafter, respondent met with the Trotts and spoke favorably of living trusts and of the dangers and costs of having their estates pass through probate. The Trotts ultimately agreed to have respondent prepare a standard living trust for them, for a fee of $1,500.

{¶ 6} Once the Trotts agreed to a living trust, respondent collected financial and other personal information from them in order to prepare the trust. Without the Trotts' knowledge or consent, respondent forwarded the Trotts' information to EPLS, who then drafted the trust document.

{¶ 7} After EPLS returned the trust document to respondent, he met with the Trotts to review and sign the document. During this meeting, respondent informed the Trotts that they would need to meet with another individual who would witness their signatures and also explain the financial aspects of funding the trust. The Trotts were later contacted by Larry Spencer, an agent of EPLS whose job was to witness client signatures and advise clients on funding their trusts. EPLS did not pay Spencer, who was compensated solely by commissions on any insurance policies or annuities that he was able to sell to trust clients. Soon after talking with Spencer, the Trotts became suspicious and filed a grievance with relator.

{¶ 8} Relator charged respondent with 11 Disciplinary Rule violations stemming from his business relationship with EPLS and his representation of the Trotts. The board found that respondent had violated DR 1–102(A)(4) (prohibiting a lawyer from engaging in conduct involving dishonesty, fraud, deceit, or misrepresentation), 1–102(A)(6) (prohibiting a lawyer from engaging in conduct that adversely reflects on a lawyer's fitness to practice law), 2–101(A) (prohibiting a lawyer from using any advertisement that is false, fraudulent, or misleading or that contains unverifiable claims), 2–101(F)(1) (barring a lawyer from soliciting legal business by telephone), 2–103(B) (prohibiting a lawyer from compensating an organization for a referral), 2–103(C) (barring a lawyer from requesting an organization to recommend or promote use of the lawyer's services), 3–102 (prohibiting a lawyer from sharing legal fees with a nonlawyer), 4–101 (requiring a lawyer to preserve a client's confidences and secrets), 5–101(A)(1) (requiring

---

1. Tolbert worked for Estate Information Services, the marketing company that EPLS used to market its services.

prior disclosure of financial or business interests that may affect professional judgment on behalf of a client), and 6–102 (barring a lawyer from attempting to limit his liability to a client for personal malpractice). The board did not find clear and convincing evidence that respondent had violated DR 2–106 (prohibiting a lawyer from charging or collecting a clearly excessive fee).

### Recommended Sanction

{¶ 9} In recommending a sanction, the board considered the aggravating and mitigating factors listed in Section 10 of the Rules and Regulations Governing Procedure on Complaints and Hearings Before the Board of Commissioners on Grievances and Discipline ("BCGD Proc.Reg.").

{¶ 10} As aggravating factors, the board found that respondent had committed multiple violations and that he refused to acknowledge fully the wrongful nature of his conduct. BCGD Proc.Reg. 10(B)(1)(d) and (g). The board also concluded that, while not actively dishonest, respondent did conceal material information from the Trotts. Respondent also had attempted to return only a portion of the Trotts' fee in exchange for a full release. See BCGD Proc.Reg. 10(B)(1)(b).

{¶ 11} In mitigation, the board found that respondent had no prior disciplinary record. BCGD Proc.Reg. 10(B)(2)(a). Further, respondent was generally cooperative during the disciplinary proceedings and was remorseful for certain segments of his misconduct. BCGD Proc.Reg. 10(B)(2)(d). The board also noted that respondent did eventually return the Trotts' entire fee but that the mitigating effect of the refund was reduced because it occurred later in the grievance process. BCGD Proc.Reg. 10(B)(2)(c).

{¶ 12} Relator argued that respondent should receive a suspension from the practice of law of one year. Respondent advised the panel that he would accept any sanction that did not result in an actual suspension. The panel recommended that respondent be suspended for one year, with six months stayed. The board adopted the panel's recommendation.

### Review

{¶ 13} The board found that respondent had paid EPLS a fee for referring clients, in violation of DR 2–103(B) (prohibiting a lawyer from compensating an organization for a referral), and that he had used EPLS to market his services, in violation of DR 2–103(C) (barring a lawyer from requesting an organization to recommend or promote use of the lawyer's services). The board also found that respondent had violated DR 3–102 (prohibiting a lawyer from sharing legal fees with a nonlawyer) because he had paid EPLS—a Michigan law firm with no attorneys licensed to practice in Ohio—50 percent of the fees that he received from each client referred to him by EPLS. Respondent was found to have violated DR 5–101(A)(1) (requiring prior disclosure of financial or business

interests that may affect professional judgment on behalf of a client) by failing to inform the Trotts of his business relationship with EPLS, including that respondent was contractually obligated to use EPLS agents for trust-funding advice.

{¶ 14} Respondent does not object to the board's findings that he violated DR 2–103(B), 2–103(C), 3–102, and 5–101(A)(1). We agree with the board that those violations were proven by clear and convincing evidence.

{¶ 15} Respondent does, however, raise several objections to the board's other findings of misconduct. Specifically, respondent objects to the board's findings that he violated DR 1–102(A)(4), 1–102(A)(6), 2–101(A), 2–101(F)(1), 4–101, and 6–102. He also challenges the board's recommended sanction, contending that his misconduct warrants only a public reprimand.

{¶ 16} *DR 1–102(A)(4).* Respondent first challenges the board's finding that he violated DR 1–102(A)(4). The board found that respondent had engaged in misrepresentation when he failed to inform the Trotts of pertinent information. Specifically, respondent never told the Trotts that he had a contract with EPLS or that he would be paying EPLS a portion of the fee that he charged them. Respondent did not tell the Trotts that his contract with EPLS required him to use EPLS for trust-funding advice and document preparation. Respondent also failed to advise the Trotts that they could simply transfer their own assets into the trust rather than rely on financial advice from EPLS.

{¶ 17} Respondent also advised the Trotts to meet with an EPLS funding agent, but he never told them that the agent was an insurance broker who would try to sell them insurance. Rather, respondent told the Trotts that the agent would merely witness them executing the trust document and advise them on funding the trust.

{¶ 18} Respondent concedes that he did not disclose to the Trotts his contractual relationship with EPLS. Nevertheless, he contends that clear and convincing evidence does not exist to support a DR 1–102(A)(4) violation. Respondent argues that despite the language of his contract, he was free to exercise his independent legal judgment when recommending the services of an EPLS funding agent. He further contends that there is no evidence that he set up the Trotts for a sales pitch but that he merely recommended a funding agent to advise the Trotts on properly transferring their existing assets into the trust.

{¶ 19} However, none of respondent's arguments addresses the board's finding that he engaged in misrepresentation when he failed to disclose pertinent information to the Trotts. For instance, respondent suggests that he exercised "independent legal judgment" in recommending an EPLS funding agent to the Trotts. Yet respondent overlooks that he never informed the Trotts that his contract with EPLS *required* him to refer the Trotts to a funding agent chosen by EPLS. Armed with that information, the Trotts could have reached their own

conclusion about the independence of respondent's legal judgment. Respondent also does not explain why he never told the Trotts that they could rely on the advice of their own financial advisor to fund the trust rather than meet with an EPLS funding agent.

{¶ 20} Respondent claims that the Trotts knew that the meeting with the funding agent was for the purpose of funding their trust. But respondent ignores his own testimony that he never advised the Trotts that the agent would try to sell them insurance. Nor can respondent avoid a disciplinary violation because the Trotts never met with the funding agent. As noted, respondent's contract required him to use EPLS to complete the trust documents and fund the trusts. Respondent was well aware that EPLS funding agents worked on commission, and that their primary objective was to sell insurance. Yet respondent never told the Trotts that they would be subject to an insurance sales pitch.

{¶ 21} Indeed, instead of offering that information, respondent arranged for the Trotts to meet with an EPLS agent under the pretext that the agent would witness their signatures on the trust document and explain the financial aspects of funding the trust. But respondent never told the Trotts that he was required to recommend an EPLS funding agent whose primary purpose was to sell insurance on commission. In short, respondent "set up his clients as sales prospects for insurance agents with no overriding commitment to their financial and personal security." *Columbus Bar Assn. v. Fishman,* 98 Ohio St.3d 172, 2002-Ohio-7086, 781 N.E.2d 204, at ¶ 20.

{¶ 22} Based on the foregoing, we find that respondent engaged in a number of misrepresentations by omission. Accordingly, we find that clear and convincing evidence exists that he violated DR 1–102(A)(4).

{¶ 23} *DR 2–101(A).* The board found that respondent had used advertisements that contained misleading, false, and unverifiable statements in violation of DR 2–101(A). Respondent admits that he had a contract with EPLS to market his services, and he does not dispute the board's findings that the advertisements were misleading, false, or unverifiable. Nevertheless, respondent asserts that he cannot be held accountable for independent actions of EPLS that were unknown to him.

{¶ 24} But respondent's claim that the marketing activities of EPLS were unknown to him is not well taken. First, respondent knew that EPLS would be engaged in direct-mail marketing on his behalf in Ohio, and yet he made no attempt to supervise these activities. He did not even review the mailings before distribution. Respondent cannot evade responsibility for these mailings by maintaining a willful ignorance of their content.

{¶ 25} Second, contrary to respondent's assertion, the evidence indicated that respondent had actual knowledge regarding the information contained in EPLS's

marketing materials. Renald Benczkowski, a Michigan attorney and president of EPLS, testified that he had shown respondent some sample marketing pieces used by EPLS. Moreover, it is undisputed that as early as March 2005, respondent had seen postcards that EPLS had mailed out on his behalf. Yet respondent continued to use EPLS's services—even accepting client referrals—after becoming aware that EPLS's marketing practices did not comply with Ohio rules.

{¶ 26} Thus, we find that clear and convincing evidence exists to establish a violation of DR 2–101(A).

{¶ 27} *DR 2–101(F)(1).* Respondent challenges the finding that he committed a violation of DR 2–101(F)(1) by soliciting legal business by telephone. Respondent faults the panel for assigning more weight to the testimony of the Trotts than to his own evidence.

{¶ 28} During the hearing, Dr. Trott testified that Tolbert—the EPLS telemarketer—had telephoned both him and his wife attempting to solicit business on behalf of respondent. Both Dr. and Mrs. Trott testified that they had not requested that Tolbert call them, and they denied returning a postcard to EPLS requesting estate-planning information. In contrast, respondent offered testimony from himself and Benczkowski that it was not EPLS's usual practice to contact consumers by telephone without having first received a return postcard.

{¶ 29} We will ordinarily defer to the panel's credibility determination in our independent review unless the record weighs heavily against those findings. See *Cincinnati Bar Assn. v. Statzer,* 101 Ohio St.3d 14, 2003-Ohio-6649, 800 N.E.2d 1117, ¶ 8. The Trotts testified unequivocally that they had not returned any postcards to EPLS or otherwise requested that EPLS contact them. Respondent was asked to produce any postcard that the Trotts had returned to EPLS, but he was unable to do so. Based on this evidence, we do not find that the record weighs heavily against the panel's credibility determination. Thus, we find that respondent violated DR 2–101(F)(1).

{¶ 30} *DR 4–101.* Respondent contends that he did not violate DR 4–101, because he provided client information to EPLS only for the purpose of assisting with document preparation. We disagree.

{¶ 31} DR 4–101(B) bars a lawyer from knowingly revealing the confidences and secrets of a client. In this matter, respondent admitted that he shared the Trotts' financial information and their Social Security numbers with EPLS without the Trotts' knowledge or express consent. Accordingly, we find that clear and convincing evidence existed to support the board's finding of a DR 4–101 violation.

{¶ 32} *DR 6–102.* The board found that respondent had violated DR 6–102, which bars a lawyer from attempting to exonerate himself from or limit his liability to a client for personal malpractice. Respondent now claims that this charge should have been dismissed.

{¶ 33} The following facts are pertinent to this issue. After Mrs. Trott's encounter with Larry Spencer, an EPLS funding agent, the Trotts became uneasy about the living trust recommended by respondent. They contacted their financial advisor, who in turn referred them to another attorney to review the trust document. After consulting this attorney, the Trotts contacted respondent, demanded a full refund, and told him that they had been advised to file a grievance with the bar association.

{¶ 34} Respondent wrote a letter to the Trotts offering a partial refund of $500 "in exchange for a full release and with the understanding that you are responsible for the remaining funding of the trust and any changes that may be needed in the future." The board found that respondent's request of a "full release" constituted a request by respondent that the Trotts release all potential claims— including malpractice claims—against him in exchange for a partial refund.

{¶ 35} Respondent maintains that his use of the term "full release" was intended merely to release him from his obligation to provide the Trotts with free legal services in the future related to their living trust. Respondent asserts that his testimony in this regard was not contradicted by the Trotts.

{¶ 36} Contrary to respondent's assertion, Dr. Trott did testify that he understood respondent's reference to a "full release" to mean a release of all claims. Moreover, Dr. Trott testified that once he had requested a full refund, he had no expectations that respondent would perform any additional legal services.

{¶ 37} We also find—as did the board—that the wording of respondent's letter is at odds with his interpretation. Respondent offered a partial refund in exchange for a full release "and" with the understanding that he would not be responsible for rendering future legal services regarding the trust. The language at issue was written in the conjunctive, indicating that the "full release" did not apply solely to respondent's future services. Thus, we find that the violation of DR 6–102 was proven by clear and convincing evidence.

{¶ 38} *DR 1–102(A)(6).* Respondent challenges the board's finding that he engaged in conduct that adversely reflects on his fitness to practice law. Respondent claims that his DR 1–102(A)(6) violation was based solely on his unwillingness to admit all disciplinary violations and on his efforts to put forth a good-faith defense. According to respondent, he is "entitled to put forth his defenses and has given testimony under oath which is entitled to be believed."

{¶ 39} However, it was neither respondent's unwillingness to admit all disciplinary violations nor his decision to defend against the charges that formed the basis of his DR 1–102(A)(6) violation. Rather, it was respondent's inability to recognize the inherent conflict between his business relationship with EPLS and his duty to the Trotts. Respondent failed to disclose his EPLS contract to the Trotts, he insisted that EPLS provided only marketing and copying services, he failed to recognize the dangers inherent in forming a business relationship with an out-of-state law firm to market his services and sell estate-planning devices, and he submitted inconsistent testimony in order to avoid being convicted of ethical violations. Even now, respondent appears unable to grasp the true nature and extent of his misconduct or to fully comprehend his professional obligations. Accordingly, we find that clear and convincing evidence exists to support a violation of DR 1–102(A)(6).

{¶ 40} *Recommended Sanction.* Respondent submits that a stayed suspension is more appropriate than the board's recommended sanction of a one-year suspension with six months stayed. In support of a stayed suspension, respondent argues that he did not assist a nonlawyer in the unauthorized practice of law, which he maintains is a more serious offense than any of the violations found by the board. Respondent further claims that he did not cause any harm to the Trotts.

{¶ 41} The board found that respondent's overall misconduct was more egregious than the misconduct of the attorney in *Disciplinary Counsel v. Wheatley,* 107 Ohio St.3d 224, 2005-Ohio-6266, 837 N.E.2d 1188. In *Wheatley,* we imposed a six-month suspension on an attorney who violated DR 3–102(A) (prohibiting a lawyer from sharing legal fees with a nonlawyer), 2–103(C) (barring a lawyer from requesting an organization to recommend or promote use of the lawyer's services), and 3–101(A) (barring a lawyer from aiding a nonlawyer in the unauthorized practice of law).

{¶ 42} We agree with the board that respondent's conduct is more serious than the misconduct by the attorney in *Wheatley.* Similar to respondent's business relationship with EPLS, Wheatley engaged the services of a company that offered financial-planning strategies primarily involving the promotion of living-trust agreements. See *Wheatley* at ¶ 3. Admittedly, unlike Wheatley, respondent did speak with and advise the Trotts prior to their purchase of the trust. Nevertheless, respondent has committed numerous disciplinary violations not at issue in *Wheatley,* including attempting to shield himself from liability and advertising his services with inaccurate statements of fact. Moreover, Wheatley did not consciously set up his clients—as did respondent—for sales presentations of insurance products, which further compromised their confidences. Cf. *Wheatley* at ¶ 39.

{¶ 43} Finally, respondent's claim that the Trotts suffered no harm is mistaken. Because of respondent's failure to fully inform the Trotts of his relationship with EPLS, the Trotts were compelled to retain—and pay—another attorney to investigate the legality of the trust prepared by respondent.

{¶ 44} Accordingly, respondent is hereby suspended from the practice of law in Ohio for one year, with six months stayed. Costs are taxed to respondent.

Judgment accordingly.

MOYER, C.J., and PFEIFER, LUNDBERG STRATTON, O'CONNOR, O'DONNELL, LANZINGER, and CUPP, JJ., concur.

———

Priscilla L. Hapner, Edward Erfurt III, Bruce A. Campbell, and A. Alysha Clous, for relator.

Philip B. Willette, pro se; and Mitchell, Allen, Catalano & Boda and William Mann, for respondent.